COURT OF APPEALS OF VIRGINIA

Present: Judges Chaney, White and Senior Judge Annunziata
Argued at Fairfax, Virginia

JOSE ANGEL RIVAS-CASTILLO

                                    MEMORANDUM OPINION[*] BY
v.      Record No. 1681-22-4           JUDGE VERNIDA R. CHANEY
                                    SEPTEMBER 10, 2024

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF LOUDOUN COUNTY
James E. Plowman, Jr., Judge

Renee Berard (Berard Robinson, PC, on brief), for appellant.

Lindsay M. Brooker, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.

A jury found Jose Angel Rivas-Castillo guilty of aggravated malicious wounding, using a

firearm in commission of a felony, and malicious discharge of a firearm in an occupied dwelling.

Code §§ 18.2-51.2, -53.1, -279. He argues that the trial court erred by (1) denying his motions for

mistrial, to set aside the verdict, and to limit the testimony of Julia Rodriguez because the

Commonwealth violated *Brady v. Maryland*[1] by failing to disclose portions of her testimony, and

(2) limiting a portion of Dr. Lisa Doll's testimony. Finding no error, this Court affirms the trial

court's judgment.

BACKGROUND

On appeal, we review the evidence "in the 'light most favorable' to the Commonwealth,

the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022)

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] 373 U.S. 83 (1963).

(quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). We therefore "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

## I. The shooting

Following a dispute over some drugs, Rivas-Castillo shot at Freddie Cabrera and Manuel Santana while they were all drinking and using cocaine together in a basement. One of the shots that Rivas-Castillo fired struck Santana, who fell to the ground. The shooting occurred in a basement rented to Rivas-Castillo by one of the Commonwealth's witnesses, Julia Rodriguez. Rodriguez was asleep upstairs in her bedroom when a neighbor knocked on her door, having heard the sound of a gunshot. When Rodriguez went to the basement, she saw Rivas-Castillo, Cabrera, and the recently shot Santana. She and Cabrera took Santana to the hospital. Rivas-Castillo did not join them, and instead ran. No one called 911 because no one "wanted trouble." Cabrera was also reluctant to involve the police because he had pending charges.

Santana and Cabrera both testified about the events that night and Santana's hospital stay. On cross-examination, Santana admitted lying to hospital personnel about the nature of his injuries. Cabrera testified that during an escalation, Rivas-Castillo "pulled out [a] rifle . . . said 'you got to go,'" and fired. He then testified that Rivas-Castillo went "oh shit," and fled. The Commonwealth admitted into evidence ammunition and two firearms found in Rivas-Castillo's basement following the execution of a warrant.

Hospital personnel also testified about Santana's treatment. Santana was hospitalized for thirty days and had "five or six surgeries." He was evasive with medical personnel when asked about his injuries, but it was apparent that he had suffered a gunshot wound. Santana incurred

significant fractures in his lower left leg, where fragments of the bullet remained. Even after his surgeries, he did not regain full feeling in his left foot.

## II. Objection to Rodriguez's testimony

When the Commonwealth called Rodriguez to testify as a witness to the events following the shooting, Rivas-Castillo moved to limit her testimony. Rivas-Castillo argued that, when the police initially interviewed Rodriguez, she walked them through the basement and explained what had happened—but Rodriguez did not say that Rivas-Castillo made any statements to her that night. However, Rivas-Castillo argued that the Commonwealth emailed him on June 10, 2021, and explained that Rodriguez, during a second interview, disclosed new statements from Rivas-Castillo. According to Rodriguez's second police interview, on the night of the shooting, Rivas-Castillo told Rodriguez not to call the police, to take Santana to the hospital, and that "[t]his is how I get respect."

Rodriguez's statements in the second interview were provided to Rivas-Castillo in the form of translated notes provided by the Commonwealth's investigator. Rivas-Castillo asserted that because he had no access to the translator used for the interview or a recording of it, he had "virtually nothing to cross-examine [Rodriguez] on because if that cross-examination leads to the type of question that was asked, [Rivas-Castillo could not] call that person."

The Commonwealth countered that it disclosed Rodriguez's statements to the defense as soon as it had them. The Commonwealth said that the interview was not recorded, but was conducted with help from an interpreter and that summary notes had been taken. It clarified that rather than provide the summary notes from the interview to defense counsel, it provided "the substance of the statements that the defendant made" in accordance with its discovery obligations. The trial court held that there was no discovery violation because the statements had been "immediately" provided to the defense.

Rivas-Castillo then moved for a mistrial claiming a *Brady* violation. Rivas-Castillo also argued that Cabrera's testimony required a mistrial because Cabrera testified that the sheriff's office promised to help him with his pending criminal charges. Rivas-Castillo said that this fact was not disclosed before trial. The trial court denied Rivas-Castillo's motion.

When Rodriguez testified, she said that she was awoken the night of the incident by a neighbor who came to her door and told her that a friend at her house had heard a shot. Rodriguez went to the basement and saw "that there was a person with a shot wound." She saw Rivas-Castillo holding "a weapon," and he told her not to call the police or an ambulance. When she asked him what happened, Rivas-Castillo allegedly said "that happens [sic] so that he would be respected." Rodriguez admitted on cross-examination that she did not disclose all these statements until her second interview with police.

### III. Dr. Lisa Doll's testimony

In the defense case, Rivas-Castillo introduced evidence but did not testify. Both his girlfriend and his older sister testified about his mental health struggles. Dr. Lisa Doll, a court psychologist, testified about having multiple meetings with Rivas-Castillo in September 2021 as part of a court-ordered evaluation.

The trial court limited Dr. Doll's testimony to (1) her clinical interviews with Rivas-Castillo (2) the medical records that she reviewed to prepare for those interviews, and (3) any of her personal observations. She testified that Rivas-Castillo suffered from schizophrenia and that he suffered from that condition on the night of the shooting. However, she could *not* testify that Rivas-Castillo suffered hallucinations that night or about what he told her of that night, as these were not matters within her personal knowledge. The following exchange drew an objection from the Commonwealth and was struck from the record:

[Defense Counsel:] And can you say, to a reasonable degree of psychological certainty, that Mr. Rivas-Castillo's schizophrenia existed on January 17[], 2021?

[Dr. Doll:] Yes, I can.

[Defense Counsel:] And why do you say that?

[Dr. Doll:] Mr. Rivas-Castillo was suffering from hallucinations --

[Commonwealth:] Objection, Your Honor.

The Court: Sustained.

[Commonwealth:] And Your Honor, if we could ask that that be stricken.

The Court: That response will be struck from the record. You are not to consider it, members of the jury.
Dr. Doll, if you can refrain from stating specifically what the defendant told you occurred on January 17[], 2021.

[Defense Counsel:] So without stating what the defendant told you, what's the basis for your belief that his schizophrenia existed at the time?

[Dr. Doll:] I don't think I can establish that without saying what he told me.

Defense counsel moved on, establishing through Dr. Doll that he suffered from schizophrenia. He asked Dr. Doll whether someone suffering from schizophrenia could fire a gun without intending it to go off in a particular direction:

[Defense Counsel:] Is it possible that someone who is actively suffering with symptoms of schizophrenia could point a gun somewhere thinking that they were pointing it in a different direction?

[Dr. Doll:] That is possible.

[Defense Counsel:] Is it possible that someone who is actively in the [throws] of schizophrenia could pull the trigger of a firearm not intending to pull that trigger?

[Dr. Doll:] That is possible.

On cross-examination, the Commonwealth confronted Dr. Doll with a February 10, 2021 clinical note from the Loudoun County Mental Health Clinic stating that, on that date, "no evidence of psychosis was noted." On redirect examination, defense counsel again put the above hypothetical to Dr. Doll, this time drawing an objection from the Commonwealth:

> [Defense Counsel:] Do you have an opinion to a reasonable degree of medical certainty regarding a -- the hypothetical effect of a person with schizophrenia holding a firearm and shooting it regarding whether they -- it's possible they could shoot it in a place they did not intend to go?
>
> [Commonwealth:] Objection, Your Honor.
>
> The Court: Sustained. Goes to ultimate issue.

Thus Dr. Doll was prohibited from answering the hypothetical.

The Commonwealth and Rivas-Castillo rested, and the jury returned a verdict finding Rivas-Castillo guilty of all charges. Rivas-Castillo timely appeals.

## ANALYSIS

Rivas-Castillo assigns two errors to the trial court. His first assignment encompasses two arguments. First, he asserts that the trial court erred by failing to grant him a mistrial and set aside the verdict, largely because of testimony adduced from Rodriguez in violation of *Brady v. Maryland*. Second, he argues that the trial court erred in denying his motion to limit Rodriguez's testimony, again because the portions of her testimony were admitted in violation of *Brady v. Maryland*. Determining "the 'admissibility of evidence is within the discretion of the trial court,' and an appellate court will not reject such decision absent an 'abuse of discretion.'" *Williams v. Commonwealth*, 71 Va. App. 462, 487 (2020) (quoting *Tirado v. Commonwealth*, 296 Va. 15, 26 (2018)). While we defer to the trial court's findings of fact, we review its compliance with *Brady v. Maryland* de novo. *See Muhammad v. Commonwealth*, 269 Va. 451, 479, 509-10 (2005).

In his second assignment of error, Rivas-Castillo argues that the trial "court erred by violating Appellant's constitutional right to due process of law and a fair trial by preventing the introduction of expert witness testimony from Dr. Lisa Doll."  We review the trial court's decision to admit expert evidence for an abuse of discretion.  *Smith v. Commonwealth*, 78 Va. App. 371, 389 (2023).  "To the extent an assignment of error involves statutory construction, we review these issues *de novo*."  *Quyen Vinh Phan Le v. Commonwealth*, 65 Va. App. 66, 76 (2015).

I.  The Commonwealth did not violate *Brady v. Maryland*.

*Brady v. Maryland* requires the Commonwealth to disclose impeachment evidence to the accused.  *United States v. Bagley*, 473 U.S. 667, 676-77 (1985).  Failure to do so can constitute a *Brady* violation and result in the reversal of a conviction impacted by the failure.  *Youngblood v. West Virginia*, 547 U.S. 867, 869 (2006).  To prove a *Brady* violation, Rivas-Castillo needs to show that Rodriguez's testimony was (1) favorable to him, (2) material to his defense, and (3) suppressed by the Commonwealth.  *E.g.*, *Church v. Commonwealth*, 71 Va. App. 107, 117 (2019).  Rivas-Castillo has not shown either materiality or suppression, and so the Commonwealth did not violate *Brady v. Maryland*.

"Suppression" means that the Commonwealth failed to disclose the evidence—either purposely or inadvertently.  *See, e.g.*, *Commonwealth v. Tuma*, 285 Va. 629, 634-37 (2013).  The Commonwealth does not violate *Brady v. Maryland* "when impeachment evidence is made 'available to [a] defendant[] during trial' if the defendant has 'sufficient time to make use of [it] at trial.'"  *Id.* at 635 (alterations in original) (quoting *Read v. Virginia State Bar*, 233 Va. 560, 564-65 (1987)).  "Material" evidence is evidence that, if disclosed, reasonably could have led to a different result at trial.  *See, e.g.*, *Church*, 71 Va. App. at 117.  A "reasonable probability" means that the likelihood of a different result is so great that absence of the evidence undermines this Court's confidence in the outcome of the trial.  *Smith v. Cain*, 565 U.S. 73, 75 (2012).

- 7 -

Rivas-Castillo first argues that the trial court should have excluded or limited Rodriguez's statements because the Commonwealth did not disclose the contents of her second interview to the defense. The trial court found, however, that the Commonwealth disclosed the fact—and the little summary it had—of that interview in June 2021, well before Rivas-Castillo's November 2021 trial.

Rivas-Castillo next argues that the Commonwealth violated *Brady* by disclosing these statements post-trial:

> 1. "Angel came upstairs come to basement [sic] . . . asked to come down take gentleman to hospital." Rivas-Castillo argues that this conflicted with Rodriguez's trial testimony that Rivas-Castillo told *her* to take the victim to the hospital after her friend came and got her and brought her downstairs.
>
> 2. "Female friend went with hospital w/them, asked what happened, V-01 did not say he had been shot." Rivas-Castillo argues that this conflicted with Rodriguez's testimony that there was no one else with her in the car to the hospital besides the victim and Cabrera.
>
> 3. "[At] house [Rodriguez] went through front door, Older [man] [went] through back door . . . basement locked, when she got home heard TV on . . . seemed like someone took everything they could." Rivas-Castillo argues that this would be useful for impeachment evidence because it conflicted with Rodriguez's testimony that Cabrera (the "older man") came back to the basement after going to the hospital.
>
> 4. "Cleaned basement . . . was not asked to clean . . . cleaned to rent – talked w/sister . . . cleaned before detectives arrived . . . Julia cleaned blood . . . no one helped . . . paid." Rivas-Castillo argues that this conflicts with Rodriguez's testimony—and the Commonwealth's emphasis on the fact—that Rivas-Castillo sent "minions" to clean up the blood in the basement from the shooting.

As for the first three statements, Rivas-Castillo conceded to the trial court that they were variously disclosed, not contradictory, or not useful for impeachment. A "party may not approbate and reprobate by taking successive positions in the course of litigation that are either inconsistent with each other or mutually contradictory." *Nelson v. Commonwealth*, 71 Va. App. 397, 403 (2020) (quoting *Rowe v. Commonwealth*, 277 Va. 495, 502 (2009)). By agreeing with the trial court's findings, Rivas-Castillo waived arguments about the admission of these statements on appeal.

As for the fourth statement, it was not material to Rivas-Castillo's defense because it had no impeachment value. The record shows that in her first interview in January 2021, Rodriguez stated that she cleaned up the blood *in her car*—not the basement—without any help. Thus Rodriguez's fourth statement in her second interview is compatible with her prior statement.

Had Rodriguez's fourth statement been available to Rivas-Castillo, it would not have enabled him to impeach Rodriguez's statement about who cleaned up the blood *in her basement*. Rodriguez's statements are not apparently contradictory. As such, pointing out the variance between these two statements would not have enabled Rivas-Castillo to successfully impeach Rodriguez.

Moreover, any error in admitting Rodriguez's testimony was harmless:

> [w]hen it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached, no judgment shall be arrested or reversed . . . [f]or any other defect, imperfection, or omission in the record, or for any error committed on the trial.

Code § 8.01-678. "In a criminal case, . . . in order to determine whether there has been 'a fair trial on the merits' and whether 'substantial justice has been reached,' [this] [C]ourt must decide whether the alleged error substantially influenced the jury. If it did not, the error is harmless." *Clay v. Commonwealth*, 262 Va. 253, 259 (2001). Even if *all* of Rodriguez's testimony was excluded, the evidence adduced against Rivas-Castillo was substantial. Santana testified about the events the night of the shooting. As did Cabrera. As did Santana's healthcare providers, who attended to Santana's injuries. Taking the evidence in the light most favorable to the Commonwealth, the jury could have found Rivas-Castillo guilty beyond a reasonable doubt. Thus, the alleged unavailability of Rodriguez's fourth statement does not undermine our confidence in the fairness of the trial.[2]

---

[2] It was similarly not error to fail to grant a mistrial because the Commonwealth did not disclose Cabrera's testimony that he was testifying because he might receive leniency from the sheriff's office. Any failure to disclose this statement did not prejudice Rivas-Castillo's defense.

II. The trial court did not reversibly err by limiting Dr. Doll's testimony.

Rivas-Castillo argues that the trial court erred by "preventing the introduction of expert testimony from Dr. Lisa Doll." Rivas-Castillo points to two lines of testimony that the trial court improperly excluded. First, Dr. Doll's testimony about whether Rivas-Castillo was experiencing hallucinations on the night of the offense. Second, Dr. Doll's answer to a hypothetical question.

A. *Dr. Doll's testimony on Rivas-Castillo's hallucinations would have been inadmissible hearsay.*

In "criminal cases, the opinion of an expert is generally admissible if it is based upon facts personally known or observed by the expert, or based upon facts in evidence." Va. R. Evid. 2:703(b). Dr. Doll's testimony about Rivas-Castillo's hallucinations would not have been based on facts personally known to her, observed by her, or in evidence. Here is the testimony in dispute:

> [Defense Counsel:] And can you say, to a reasonable degree of psychological certainty, that Mr. Rivas-Castillo's schizophrenia existed on January 17[], 2021?
>
> [Dr. Doll:] Yes, I can.
>
> [Defense Counsel:] And why do you say that?
>
> [Dr. Doll:] Mr. Rivas-Castillo was suffering from hallucinations --
>
> [Commonwealth:] Objection, Your Honor.
>
> The Court: Sustained.
>
> [Commonwealth:] And Your Honor, if we could ask that that be stricken.
>
> The Court: That response will be struck from the record. You are not to consider it, members of the jury.
> Dr. Doll, if you can refrain from stating specifically what the defendant told you occurred on January 17[], 2021.

Rivas-Castillo discovered this evidence while cross-examining Cabrera, and was able to use it to impeach him. Because Rivas-Castillo was able to make full use of this statement, he cannot show how any suppression could have materially affected his case.

> [Defense Counsel:]  So without stating what the defendant told you, what's the basis for your belief that his schizophrenia existed at the time?
>
> [Dr. Doll:]  I don't think I can establish that without saying what he told me.

The Commonwealth objected to Dr. Doll testifying that Rivas-Castillo was hallucinating on the night of the offense because Dr. Doll was not present at the crime scene and that information was provided to her by Rivas-Castillo.  As such, Dr. Doll's testimony about his hallucinations would have depended entirely on hearsay.  This made Dr. Doll's testimony about hallucinations inadmissible, and the trial court did not err by excluding it.

B. *Excluding Dr. Doll's answer to a hypothetical, if error, was harmless.*

Rivas-Castillo argues that the trial court erred by excluding Dr. Lisa Doll's testimony responding to a hypothetical question because that testimony was admissible under Code § 19.2-271.6:

> [Defense Counsel:]  Do you have an opinion to a reasonable degree of medical certainty regarding a -- the hypothetical effect of a person with schizophrenia holding a firearm and shooting it regarding whether they -- it's possible they could shoot it in a place they did not intend to go?
>
> [Commonwealth:]  Objection, Your Honor.
>
> The Court:  Sustained.  Goes to ultimate issue.

The Commonwealth objected and the trial court prohibited Dr. Doll from answering the defense's hypothetical because her expected answer embraced an ultimate issue.  Any error in limiting Dr. Doll's testimony was harmless because it did not impact the outcome of Rivas-Castillo's trial.

For one thing, the excluded testimony was cumulative with testimony Dr. Doll had already given:

> [Defense Counsel:]  Is it possible that someone who is actively suffering with symptoms of schizophrenia could point a gun

- 11 -

> somewhere thinking that they were pointing it in a different
> direction?
>
> [Dr. Doll:]  That is possible.

Both lines of testimony answered the same question: is it possible that Rivas-Castillo meant to fire his gun in a direction other than the one he was pointing?

For another, the evidence adduced against Rivas-Castillo at trial was substantial.  "An error is harmless 'if other evidence of guilt is so overwhelming and the error so insignificant by comparison that the error could not have affected the verdict . . . .'"  *Salahuddin v. Commonwealth*, 67 Va. App. 190, 212 (2017) (quoting *McLean v. Commonwealth*, 32 Va. App. 200, 211 (2000)). The evidence against Rivas-Castillo included: (1) Rodriguez's testimony; (2) Cabrera's testimony; (3) Santana's testimony; (4) hospital personnel's testimony; and (5) guns and ammunition from the scene of the shooting, obtained by warrant.  The accumulated evidence established Rivas-Castillo as the shooter, as well as Santana's injuries.

So, even had Dr. Doll answered this hypothetical, and the answer undermined the Commonwealth's evidence, a jury would have been entitled to disbelieve it and believe the Commonwealth.  *See, e.g.*, *Kelley v. Commonwealth*, 69 Va. App. 617, 626 (2019) ("[T]he finder of fact, 'who determines the credibility of the witnesses and the weight accorded their testimony, may accept or reject the testimony in whole or in part.'" (quoting *Perkins v. Commonwealth*, 31 Va. App. 326, 331 (2000))).  With or without Dr. Doll's excluded testimony, the evidence was sufficient to allow the jury to find Rivas-Castillo guilty beyond a reasonable doubt.

CONCLUSION

The trial court did not err by refusing to limit Rodriguez's testimony or grant a mistrial. Rodriguez's interview statements were neither suppressed nor material under *Brady v. Maryland*.

Nor was there reversible error in excluding Dr. Doll's testimony.  Accordingly, this Court affirms the trial court's judgment.

*Affirmed.*